```
                                          ORIGINAL

           IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * *

TINA C. NGUYEN, O.D.,         :

        Plaintiff,            :

   versus                     :  CIVIL ACTION NO:

VOORTHUIS OPTICIANS, INC.,    :  06-CV-485 (EGS)

        Defendant.            :

* * * * * * * * * * * * *
```

                                    Arlington, Virginia

                                    Monday, January 7, 2008

Deposition of

                    REBECCA VOORTHUIS,

the witness, called for examination by counsel for the Plaintiff, pursuant to notice by Larry J. Stein, held in the Law Offices of Larry Stein, 2009 North Fourteenth Street, Suite 708, Arlington, Virginia 22201, beginning at 9:45 o'clock a.m., before Laura L. Jackson, a Verbatim Reporter and Notary Public, when there were present on behalf of the respective parties:

ACTION SOLUTIONS
FALLS CHURCH, VA
ActionSolutions@cox.net
(703) 204-1415

4

```
 1                    P R O C E E D I N G S :
 2   Whereupon,
 3                    REBECCA VOORTHUIS,
 4   the witness, was called for examination by counsel on
 5   behalf of the Plaintiff, and, having been first duly
 6   sworn by the Notary Public, was examined and testified
 7   as follows:
 8             EXAMINATION BY COUNSEL FOR THE PLAINTIFF
 9             BY MR. STEIN:
10        Q.   Well, good morning.
11        A.   Good morning.
12        Q.   Thanks for coming by.  This is a deposition
13   concerning the second company.
14             Would you please state, for the record, the
15   official full name of your company.
16        A.   Dr. Voorthuis, O.D. & Associates, P.C.
17        Q.   Okay, thank you.  And where is it
18   headquartered?
19        A.   In Old Town Alexandria.
20        Q.   And you have a second location?
21        A.   In Reston, Virginia.
22        Q.   But the headquarters location is the Old Town
```

1  your company formed?
2     A.   In February of 2006.
3     Q.   And how did that come about? What were the
4  terms of the transaction?
5     A.   It was just divided from Voorthuis Opticians
6  as a separate company entity, and I was named as the
7  President.
8     Q.   Was there a sale? Did your company purchase
9  any of the assets, such as the store locations or
10 anything else from Voorthuis Opticians, Inc.?
11    A.   It was a legal transaction. I don't know if
12 you would call it a sale, but it was designated as a
13 separate corporate entity. And I was determined to be
14 the owner.
15    Q.   Right. Now do you know if any funds changed
16 hands? Did you purchase any of the assets of Voorthuis
17 Opticians?
18    A.   It -- I believe so, yes.
19    Q.   Do you know the amount?
20    A.   No.
21    Q.   Now let me ask you separately about the
22 records. When I say patient medical files, for ease of

```
 1      Q.   Okay.  And you're not subleasing from your
 2   father or from Voorthuis Opticiens?
 3      A.   We don't pay Voorthuis, we pay directly to
 4   the landlord.
 5      Q.   Okay, thanks.  (Pause.)
 6           Let me ask you about the copying of the files
 7   and the files themselves.  I asked Mr. Morley a series
 8   of questions, and I asked you the same questions pretty
 9   much.
10      A.   Okay.
11      Q.   I'm just trying to get a handle on what
12   happened.
13      A.   Uh-huh.
14      Q.   First of all, how did the -- who came up with
15   the idea that the records should be copied?  How did
16   that happen?
17           MR. PRESS:  Objection; you'll probably get
18   the answer from my objection, but I'm going to object
19   as privileged.
20           MR. STEIN:  Okay.  Now I'm not asking for any
21   legal advice.  If --
22           MR. PRESS:  Well, then don't ask that
```

1  question.
2         MR. STEIN: Well, if you gave the advice, if
3  you ordered that copies be made --
4         MR. PRESS: I will tell you that it was done
5  on the advice of counsel.
6         MR. STEIN: Okay, that's fine.
7         MR. PRESS: Whether it was me or someone
8  else, I'm not going to tell you, and you're not going
9  to -- I'm not going to let you ask any more questions
10 about -- as I said you --
11        MR. STEIN: Well, I can ask --
12        MR. PRESS: -- can ask --
13        MR. STEIN: -- but you just told me you would
14 instruct her not to answer.
15        MR. PRESS: Yeah, that's fine.
16        MR. STEIN: Okay. All right, that's fine.
17        BY MR. STEIN:
18     Q.   Approximately when did you embark on the task
19 of getting the copies -- the records copied?
20     A.   To the best of my recollection I don't
21 believe any earlier than late spring of 2007. And I
22 believe the bulk of the copying took place and was

1  completed by late summer, very early fall 2007.
2      Q.  Now do you mean to say 2007 and not 2006?
3      A.  Yes.  Yes.
4      Q.  Okay.  What was the -- what was the method
5  whereby the files were copied?
6      A.  It was originally started --
7      Q.  I'm sorry.  Let me --
8      A.  Yes.
9      Q.  I apologize.  Let's talk now about the files
10 in Alexandria.
11     A.  Okay.  It was originally started by Dr.
12 Christine Wisecarver when she had down time and wasn't
13 seeing patients.  She started with the beginning of the
14 alphabet, going through and pulling charts that Dr.
15 Nguyen, now Burr, saw and was copying them.  And I
16 believe she got through two letters of the alphabet and
17 just realized it was going to be, you know, a very time
18 consuming task.
19          So the files were then -- at some point, I
20 don't know immediately thereafter, I don't remember, I
21 think there was a bit of a pause in the copying at that
22 point.  And then the files were transferred to Foxhall

1  Square where we have a faster copier machine.  And the
2  copying resumed then and there at that office.
3  　　　　　And when they started being copied at Old
4  Town, it was -- I think the majority of the copying
5  took place by Dr. Christine Wisecarver, but opticians
6  there also, I believe, helped.  I was not present for
7  any of that copying.
8  　　　Q.　Approximately how many files are we talking
9  about?
10  　　　A.　That's a good question.  Of course I could
11  give you a definite count.  I don't know off the top of
12  my head.  I would say maybe -- again, this is a very --
13  it could be very inaccurate, this estimate, but I would
14  say 1,500 to 2,000, but I don't at all say if that's
15  accurate.
16  　　　Q.　That's your guesstimate.
17  　　　A.　Yes.
18  　　　Q.　Were you in charge of the copying?  Did you
19  give the instructions on how it was to take place?
20  　　　A.　Yes, I advised how to do it, both when it was
21  done in Old Town and when it was done in Foxhall
22  Square.

1    Q.   Now are you aware, Dr. Voorthuis, that the
2    Notice of Deposition for today's event required that
3    you bring the records with you?
4         MR. PRESS:  And we served an objection to
5    doing that.
6         MR. STEIN:  How did you serve it?
7         MR. PRESS:  Mail.
8         MR. STEIN:  I don't have it.
9         MR. PRESS:  I mailed it.
10        MR. STEIN:  Okay.  I was going to ask you
11   about that.  When --
12        MR. PRESS:  It just objects on the grounds
13   that --
14        MR. STEIN:  Well, you told me you were going
15   to object --
16        MR. PRESS:  Yeah --
17        MR. STEIN:  -- but I never received it.
18        MR. PRESS:  I can't explain the mail.
19        MR. STEIN:  Okay.
20        MR. PRESS:  But we did object and the grounds
21   were that they are privileged.  It's protected by
22   HIPPA.  It's the only thing -- I mean we're not going

1  to produce the files when your ultimate goal in this
2  litigation is to get the files.
3       MR. STEIN: What about burden?
4       MR. PRESS: I'm sure I asserted that as well.
5       MR. STEIN: When did you mail it, I mean how
6  long ago?
7       MR. PRESS: I think it was on the 1st or the
8  2nd.
9       MR. STEIN: Okay. Well, I can't respond
10 until I've seen the objection, but I wanted to ask
11 about that.
12      MR. PRESS: It was the same grounds that had
13 been asserted previously with regard to producing
14 records.
15      BY MR. STEIN:
16    Q. Now with respect to the Old Town location,
17 how many people were involved in the copying process?
18    A. I believe no more than three, possibly only
19 two.
20    Q. Who were they?
21    A. Dr. Christine Wisecarver and another optician
22 there, and I don't -- I could find out for you exactly

```
 1   who but I don't know who.  I just know two
 2   conversations with Dr. Wisecarver that she would
 3   sometimes -- if she had a patient and she was in the
 4   middle of copying, she would hand it off to someone
 5   there.  But she was primarily the person doing the
 6   copying.
 7        Q.   I thought you said though that she had done
 8   the first two letters and then saw it was --
 9        A.   "A's" and "B's", right --
10        Q.   -- too much?
11        A.   So when I mentioned that, I was referring to
12   the copying that she did, which were I believe the
13   "A's" and the "B's".
14        Q.   Okay.  And then she delegated the rest?
15        A.   No.  You mean the rest of the alphabet?
16        Q.   Right.
17        A.   No.  The rest of -- I mentioned, in my
18   previous answer, that when it was determined that it
19   was too time-consuming and that the copy machine in Old
20   Town wasn't efficient, the rest of the records were
21   copied at the Foxhall Square main office.
22        Q.   Now who made the copies of the Foxhall Square
```

```
 1   office?
 2        A.   John Morley, Pat -- Patricia Hines, who is
 3   another employee there, and Jack Beall. And there may
 4   have been others, but I believe that those were the
 5   three primary people who were making the copies.
 6        Q.   When the copies were begun at Old Town, were
 7   you supervising the process?
 8        A.   No. I said I was not present during any of
 9   the copying at that office.
10        Q.   In Old Town.
11        A.   In Old Town.
12        Q.   So Dr. Wisecarver was supervising the
13   process.
14        A.   She was doing it.
15        Q.   She was doing it.
16        A.   For the most part.
17        Q.   When the copies -- when the rest of the
18   copying took place at Foxhall, who was supervising the
19   process there?
20        A.   I was present when I was in the office, and I
21   saw the copies being made. John Morley was making
22   copies.
```

1    So there was no one designated to oversee
2  people making copies. I mean we knew what was -- we
3  told people -- when I say we, John Morley and myself
4  told people what to do if we wasn't doing it himself.
5    Q.  Now what type of quality control did you have
6  in place? I'm trying to figure out what you were able
7  to do to ensure that nothing went wrong.
8    A.  There was no reason to think that anything
9  would go wrong. So we told people what to do and they
10 did it and that was it.
11   Q.  Okay. How long a period of time did it take
12 to get them copied?
13   A.  Again, without giving an exact amount of days
14 that was involved, I would say the majority of the
15 copying took place over a three-week timeframe, to the
16 best of my estimation, my memory.
17   Q.  So except for the "A's" and the "B's", you
18 sent the rest of the originals to Foxhall, correct?
19   A.  (Affirmative nod.)
20   Q.  And how did that happen? Who handled the
21 transportation of the files?
22   A.  I believe Anna-marie had put them in boxes in

```
 1   her trunk of her car and delivered them to Foxhall
 2   Square. And when I say I believe, it could have also
 3   been at one point my dad bringing some records over.
 4   But I'm pretty certain that Anna-marie did it.
 5        Q.   Was Anna-marie involved in any of the
 6   copying?
 7        A.   No.
 8        Q.   Why not?
 9        A.   Just because. I should say definitely not at
10   Foxhall, and I'm pretty sure, as I mentioned, when Dr.
11   Wisecarver was doing the "A's" and "B's" at Old Town, I
12   can't say for sure that Anna-marie did not copy a
13   single file but I don't believe that she was a primary
14   -- she was busy with other aspects of -- being in the
15   office at Old Town at that time.
16        Q.   And apart from assisting, what was Mr.
17   Morley's role, or was that his only role, assisting in
18   the actual copying?
19        A.   Yes. I don't -- yes.
20        Q.   Where are the original files with Dr. Burr's
21   original signature --
22        A.   In Old Town.
```

Case 1:06-cv-00485-EGS    Document 22-5    Filed 02/27/2008    Page 14 of 14

22

```
1     Q.    -- today?

2     A.    Yes.

3     Q.    And the Reston --

4     A.    In Reston.

5     Q.    -- files?  Are you able to give a rough
6   estimate of the numbers of files in Reston?

7     A.    A lot less.  Again, a very rough estimate
8   would be maybe 500, but I don't want to give any
9   impression that this is accurate because I'm really --

10    Q.    That's fair --

11    A.    -- not certain.

12    Q.    Why were the original records moved to the
13  D.C. location for copying?

14    A.    Because as mentioned in my previous answer,
15  it was too time-consuming of a process to complete the
16  copying at the Old Town office.  There's a fax machine
17  there that they were using to copy, and we have a
18  proper copy machine at Foxhall Square that's faster.

19    Q.    Did you have any concerns about the integrity
20  of the original files in transporting that many records
21  to D.C.?

22    A.    No.
```

ACTION SOLUTIONS
FALLS CHURCH, VA
ActionSolutions@Cox.net
(703) 204-1415